IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

TIMOTHY J. SHADLE,                          :
                                            :
            Plaintiff,                      :
                                            :
      v.                                    :      3:13-CV-02169
                                            :      (Judge Mariani)
NEXSTAR BROADCASTING                        :
GROUP, INC.,                                :
                                            :
            Defendant.                      :

## MEMORANDUM OPINION

### I.    Introduction

Plaintiff Timothy J. Shadle ("Shadle") filed a three-count Complaint (Doc. 1) against

Defendant Nexstar Broadcasting Group, Inc. ("Nexstar"), alleging negligence (Count I),

defamation (Count II) and false-light invasion of privacy (Count III).  Presently before the

Court is Nexstar's Motion to Dismiss (Doc. 5).  For the reasons that follow, the Court will

grant Defendant's Motion as to Count I and will deny it as to Counts II and III.

### II.   Factual Allegations

Since 1980, Shadle has owned and operated All-American Gold and Silver

Exchange, a sole proprietorship in Monroe County, Pennsylvania that buys and sells

precious metals.  (Compl. at ¶¶ 2, 5.)  In 1984, Pennsylvania passed an Act regulating the

purchase and sale of precious metals (the "Metals Act"), 73 Pa. Stat. Ann. §§ 1932-42

(West 2013), which requires pawnshops and commodity dealers to be licensed, to pay an

annual fifty dollar fee and to report all commodity transactions to their local District

Attorney's Office. (Compl. at ¶ 6.) Upon passage of the Metals Act, Shadle attained the requisite licensing and contacted the Monroe County District Attorney regarding the reporting requirements. (*Id*. at ¶¶ 7, 8.)

Although the Metals Act directs "[e]very dealer in precious metals [to] keep a record of every transaction" and to deliver a "copy of every record of transaction . . . [to] the district attorney of the county in which a purchase of precious metals is made by the close of the next working day after the day on which the metal was purchased," § 1933(a), (c), "the District Attorneys of Monroe County were following a policy of 'benign neglect' and only acted when there were complaints by customers concerning specific misconduct." (Compl. at ¶¶ 9, 11.) The District Attorney informed Shadle that he should not comply with the reporting requirements. (*Id*. at ¶ 10.) Instead, the District Attorney instructed Shadle to create and maintain records of his precious metals transactions for law enforcement's inspection. (*Id*.) However, the District Attorney told Shadle not to send the reports to the District Attorney's Office. (*Id*. at ¶ 12.) Shadle abided by these instructions for the following twenty-four years without consequence. (*Id*. at ¶¶ 12-13.) During this period, law enforcement periodically requested Shadle's records, and he complied. (*Id*. at ¶ 13.)

On June 6, 2012, Shadle "neglected to pay the $50.00 annual fee for the Precious Metals Act license." (*Id*. at ¶ 16.) As a result, Shadle's license "expired and remained expired for a period of approximately 59 days." (*Id*.) Despite the lapse, Shadle continued to maintain records of his transactions. (*Id*. at ¶ 17.)

On August 6, 2012, "law enforcement officers from the Monroe County Sheriff's Department entered Plaintiff's business and requested to see a current Precious Metals Act license as well as records of all transactions for a period of the last 60 days." (*Id.* at ¶ 18.) Plaintiff complied. (*Id.*) He produced records of the fifty transactions and his license, which at that point was current. (*Id.*) Upon inspection, the investigator realized that Shadle's license had lapsed. (*Id.*) On August 22, 2012, Shadle was charged with fifty misdemeanor counts operating without a license and fifty counts of failing to report in violation of the Metals Act. (*Id.* at ¶ 19.)

"On August 23, 2012 and also on August 24, 2012, Defendant Nexstar, ran several 'teasers' and telecasts in which they falsely reported that Plaintiff was 'scamming' his customers. Specifically, Defendant's reported that Plaintiff was a 'scam artist;' a 'shady business[man]' and that Plaintiff had 'duped [his] customers.'" (*Id.* at ¶ 21.) Plaintiff attaches three screenshots and two transcripts of the teasers and telecasts to his Complaint. (*Id.*, Exs. A-E.) The screenshots show Plaintiff's Monroe County business and its billboard superimposed with the subcaptions "SCAM ARTISTS" and "GOLD SELLING SCAMS." (*Id.*, Exs. A-C.)

The first transcript states,

**DREW SPEIER**:        If you're looking to sell gold or silver watch out for some scam artists out there.  Monroe County detectives say Timothy Shadle operated his jewelry buying business without a license for more than a month.  He's the owner of All-American Gold and Silver Exchange in Scotrun.

3

>They say he did not report all of his purchases to the District Attorney's office, which is against the law. He's facing 100 misdemeanor charges.

(*Id.*, Ex. D.)

The second attached transcript reads,

| | |
|---|---|
| **BROADCASTER:** | Facts at 5 on Eyewitness News. |
| **LAURIE MONTEFORTE:** | With the economy still down, selling gold is going up. What you need to know to avoid being scammed. |
| **CANDACE KELLY:** | Good evening, everyone, and thank you for joining us. I'm Candace Kelly. |
| **DREW SPEIER:** | And I'm Drew Speier. Buyer and seller beware. With the economy still struggling more and more people are selling their gold and silver. |
| **CANDACE KELLY:** | And that's opened the door for scam artists and shady businesses to do customers. A Monroe County man was just charged with 100 violations at his gold buying business. An eyewitness news reporter, Laurie Monteforte, has more from Monroe County. |
| **LAURIE MONTEFORTE:** | The owner of All American Gold and Silver Exchange in Scotrun is accused of 100 misdemeanors. |
| **J.J. CARILLO:** | Nothing really surprises me nowadays, especially around here. |
| **LAURIE MONTEFORTE:** | Monroe County detectives say Timothy Shadle operated his jewelry buying business without a license for more than a month. They also say he didn't report of his purchases to the District Attorney's office. That's against the law. |

**RALPH CIPRIATI:**        I think that's wrong.  The times that we're in right now, we're in some bad times.

**LAURIE MONTEFORTE:**    Shadle is supposed to keep tract of every transaction.  Buyers are supposed to detail exactly what they buy and photocopy ID from the seller.  This helps police find thieves if somebody reports jewelry stolen.

**DET. CODDINGTON:**      For police, when there's robberies, burglaries, different things like that.

**LAURIE MONTEFORTE:**    Some customers worry if Shadle wasn't honest with the government, he might not have been honest with them.

                                    One woman who did not want to go on camera with us says she's not surprised.  She told us she tried to sell gold here and was offered $175 less than she got at other gold buying businesses.

                                      Detectives have some advice.  Make sure you are selling gold to a reputable dealer first.  Make sure the place has a state license displayed.  Also, check for a state approved scale.  It should have a green state sticker on it.  Make sure the shop weighs your gold in front of you.  And finally, know that the shop is required to have a list of buying prices displayed so everyone gets the same deal.  A few simple steps will make sure you get the money you deserve when you sell your metal. In Scotrun, Laurie Monteforte, Eyewitness News.

(*Id.*, Ex. E.)

On October 9, 2012, "the Commonwealth dismissed any and all criminal charges filed against Plaintiff under the Precious Metals Act.  Instead, the Commonwealth

suggested, and the Plaintiff agreed, to a judicial disposition by a plea to Disorderly Conduct." (*Id.* at ¶ 24.)

## III. Standard of Review

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"Though a complaint 'does not need detailed factual allegations, . . . a formulaic recitation of the elements of a cause of action will not do.'" *DelRio-Mocci v. Connolly Prop. Inc.*, 672 F.3d 241, 245 (3d Cir. 2012) (citing *Twombly*, 550 U.S. at 555). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a district court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citations, alterations, and quotation marks omitted). This "plausibility" determination will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## IV. Analysis

### a. Defamation

"Under Third Circuit jurisprudence, the Court must apply a two-step approach when presiding over a defamation action. The Court must determine: '(1) whether the defendants have harmed the plaintiff's reputation within the meaning of state law; and (2) if so, whether the First Amendment nevertheless precludes recovery.'" *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 476 (E.D. Pa. 2010) (quoting *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1077 (3d Cir. 1985) (internal quotation marks omitted)).

Pennsylvania law has codified the elements of defamation under 42 Pa. Const. Stat. Ann. § 8343(a) (West 2013). *See Graboff v. Colleran Firm*, 744 F.3d 128, 135 (3d Cir.

2014) (citing *Tucker v. Fischbein*, 237 F.3d 275, 281 (3d Cir. 2001)). § 8343(a) provides

that a plaintiff has the burden of proving

> (1)     The defamatory character of the communication.
> (2)     Its publication by the defendant.
> (3)     Its application to the plaintiff.
> (4)     The understanding by the recipient of its defamatory meaning.
> (5)     The understanding by the recipient of it as intended to be applied to
>         the plaintiff.
> (6)     Special harm resulting to the plaintiff from its publication.
> (7)     Abuse of a conditionally privileged occasion.

Once a plaintiff has established these elements, the defendant bears the burden of

proving "(1) [t]he truth of the defamatory communication[,] (2) [t]he privileged character of

the occasion on which it was published [or] (3) [t]he character of the subject matter of

defamatory comment as of public concern." § 8343(b).

As a preliminary inquiry, courts must determine whether the statements in question

are "capable of a defamatory meaning." *Graboff*, 744 F.3d at 135. "A statement is

defamatory if 'it tends so to harm the reputation of another as to lower him in the estimation

of the community or to deter third persons from associating or dealing with him.'" *Id.* at 136

(quoting *Tucker*, 237 F.3d at 282). "It is not enough that the victim of the [statements] . . .

be embarrassed or annoyed, he must have suffered the kind of harm which has grievously

fractured his standing in the community of respectable society." *Tucker v. Phila. Daily*

*News*, 577 Pa. 598, 848 A.2d 113, 124 (2004) (quoting *Scott-Taylor, Inc. v. Stokes*, 425 Pa.

426, 229 A.2d 733, 734 (1967)) (brackets in *Tucker*). "In determining whether a

8

communication is defamatory, the court must view the statement 'in context' with an eye toward 'the effect the [statement] is fairly calculated to produce, [and] the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001) (quoting *Baker v. Lafayette Coll.*, 516 Pa. 291, 296, 532 A.2d 399, 402 (1987)) (brackets in *Remick*).

In support of its Motion to Dismiss, Nexstar infuses its brief with several affirmative defenses, which are generally[1] not applicable in the context of a Rule 12(b)(6) motion. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004) ("[A]n affirmative defense may not be used to dismiss a plaintiff's complaint under Rule 12(b)(6)."); *Morgenstern v. Fox Television Stations of Philadelphia*, CIV.A. 08-0562, 2008 WL 4792503, at *9 (E.D. Pa. Oct. 31, 2008) (noting that § 8343(b) affirmative defenses in a defamation suit are "not appropriate" at the motion to dismiss stage). Nexstar raises each of the § 8343(b) affirmative defenses in its Brief in Support. (Doc. 8.) As a result, the Court must disentangle these defenses, and other extrinsic matters Nexstar raises, and analyze its arguments for dismissal solely based on face of the Complaint.

Nexstar advances four possible grounds for granting its Motion to Dismiss. First, it asserts that its statements "***never*** accused Plaintiff of 'scamming' his customer, of being a 'scam artist' or running a 'shady business.'" (Reply Br., Doc. 20, at 1 (emphasis in original).)

---

[1] *Johnson v. Res. for Human Dev., Inc.*, 860 F. Supp. 218, 221 (E.D. Pa. 1994) ("A privilege to publish defamatory matter is an affirmative defense that has been considered on a Rule 12(b)(6) motion to dismiss, *Schiavone Const. Co. v. Time, Inc.*, 847 F.2d 1069, 1075 (3d Cir. 1988), but an affirmative defense will not generally support a Rule 12(b)(6) motion to dismiss.")

Second, Nexstar argues that Shadle fails to state a claim upon which relief can be granted because, "the alleged defamatory statements were either truthful or opinions[.]" (Br. in Supp., Doc. 8, at 11-17, 21.) Third, Nexstar contends that Shadle is a limited-purpose public figure and does not allege actual malice as required by the First Amendment. (Id. at 9-11, 13-15.) Fourth, it asserts that Shadle's claims "are barred by Pennsylvania's Fair Report Privilege." (Id. at 17-19.)

The main questions for the Court to consider are (1) whether Nexstar's alleged statements are capable of a defamatory meaning and (2) whether Shadle is a limited-purpose public figure. The other arguments Nexstar asserts are affirmative defense under § 8343(b) and are, therefore, inappropriate for resolution on a Rule 12(b)(6) motion. See Fanelle v. LoJack Corp., 79 F. Supp. 2d 558, 562 (E.D. Pa. 2000) (motion to dismiss, hereinafter "Fanelle I") ("While defendant's argument is compelling, the resolution of the substantial truth of defendant's [statement] is not appropriate on a motion to dismiss under Rule 12(b)(6) because it takes the Court beyond the pleadings." (footnote and internal quotation marks omitted)); Morgenstern, 2008 WL 4792503, at *9.

*i. Nexstar's alleged statements are capable of a defamatory meaning.*

The Third Circuit has recently stated that, though it was "not aware of any Pennsylvania Supreme Court case on the point, inferior Pennsylvania courts applying Pennsylvania law" have recognized the doctrine of "defamation-by-implication." Graboff, 744 F.3d at 136 (citing Dunlap v. Philadelphia Newspapers, Inc., 301 Pa. Super. 475, 448

10

A.2d 6, 15 (1982) (adopting defamation by innuendo theory); *Mzamane*, 693 F. Supp.2d at

476-78 (collecting defamation-by-implication cases)).  Defamation-by-implication may occur

if "the defendant juxtaposes [a] series of fact[s] so as to imply a defamatory connection

between them, or [otherwise] creates a defamatory implication . . . he may be held

responsible for the defamatory implication, unless it qualifies as an opinion, even though

particular facts are correct." *Fanelle v. Lojack Corp.*, CIV.A.  99-4292, 2000 WL 1801270, at

*3 (E.D. Pa. Dec. 7, 2000) (summary judgment, hereinafter "*Fanelle II*") (quoting Prosser,

*The Law of Torts*, § 116 (5th ed., Supp. 1988)) (alteration in *Fanelle II*).[2]

Here, Nexstar's alleged statements are capable of a defamatory meaning.  *See*

*Graboff*, 744 F.3d at 135.  Nexstar's statements juxtapose its suggestion that viewers

"looking to sell gold or silver" should "watch out for some scam artists out there" with its

reporting "Monroe County detectives say Timothy Shadle operated his jewelry buying

business without a license for more than a month." (Compl., Ex. D.)  The word "scam" is

defined as "a fraudulent or deceptive act or operation." *Scam*, Merriam-Webster.com.,

---

[2] The *Fanelle II* further illustrates the notion of defamation-by-implication with the following example:

A local newspaper might publish an article with the following lead: "Rev. Olsen Oratoria, a married man and pastor of a large local congregation, was spotted late last evening exiting the home of one Theresa Terpsichorea, a local exotic dancer, his suit rumpled, belt undone, and shirt untucked." Suppose that, in fact, Theresa was a Yoga instructor, and that the good reverend was one of 20 people leaving her house following Yoga class, each of them equally rumpled from the evening's contortions which had not involved any private or nefarious acts between Olsen and Theresa. Every fact in the article may have been true, however, there is no question that the facts as presented, would leave a reasonable reader with the untrue impression that the good reverend and Theresa were engaged at least in a private liaison of questionable nature. Privilege issues aside, a jury could find such an implication to be defamatory.

2000 WL 1801270, at *3.

http://www.merriam-webster.com/dictionary/scam (last visited July 9, 2014).  A possible implication of this juxtaposition is that Shadle, not only allowed his license under the Metals Act to lapse, but that he operated a "shady business," defrauding and deceiving his customers.[3]  *See Gordon v. Lancaster Osteopathic Hosp. Ass'n, Inc.*, 340 Pa. Super. 253, 489 A.2d 1364, 1368 (1985) ("Even where a plausible innocent interpretation of the communication exists, if there is an alternative defamatory interpretation, the issue must proceed to the jury.");  *Franklin Prescriptions, Inc. v. New York Times Co.*, 267 F. Supp.2d 425, 434-35 (E.D. Pa. 2003) (applying Pennsylvania law and concluding that an article was actionable where certain information was omitted which resulted in a defamatory implication that the plaintiff was involved in the unlawful sale of prescription drugs); *Fanelle II*, 2000 WL 1801270, at *2-3 (finding that a promotional package issued by a vehicle theft detection company that included an undisputedly true article documenting the plaintiff's arrest for vehicle theft charges was capable of defamatory meaning because taken as a whole it created the implication that the plaintiff was a thief).

Another Nexstar telecast makes it even clearer that Nexstar's statements are capable of a defamatory meaning.

> **LAURIE MONTEFORTE:**   Shadle is supposed to keep tract of every transaction.   Buyers are supposed to detail exactly what they buy and photocopy ID from the

---

[3] Nexstar appears to acknowledge that Shadle has pled defamation-by-implication. (*See* Br. in Supp. at 14 ("Paragraph 23 of the Complaint purports to delineate the allegedly false and defamatory statements. Subparagraphs (a) through (g) all reference 'scam' or some derivation of it, but none allege that Plaintiff was specifically referred to as a 'scam artist.' The clear import of these allegations is that the pictures *implied* that Plaintiff was scamming his customers.") (emphasis in original).)

|  | seller.  This helps police find thieves if somebody reports jewelry stolen. |
|---|---|
| **DET. CODDINGTON:** | For police, when there's robberies, burglaries, different things like that. |
| **LAURIE MONTEFORTE:** | Some customers worry if Shadle wasn't honest with the government, he might not have been honest with them.  One woman who did not want to go on camera with us says she's not surprised. She told her she tried to sell gold here and was offered $175 less that she got at other buying businesses. |
|  | Detectives have some advice.  Make sure you are selling gold to a reputable dealer first. . . . |

(*Id.*, Ex. E.)

These statements can fairly be interpreted as suggesting that Shadle (1) was not keeping track of his purchases in violation of the Metals Act,[4] (2) purchased stolen jewelry, (3) dealt dishonestly with his customers and (4) was a disreputable dealer.

Thus, Nexstar's statements are capable of a defamatory meaning.  *See Graboff*, 744 F.3d at 135.

 *ii. The Complaint does not suggest that Shadle is a limited-purpose public figure.*

 In *American Future Systems, Inc. v. Better Business Bureau of Eastern Pennsylvania,* 592 Pa. 66, 923 A.2d 389 (2007), the Pennsylvania Supreme Court confronted the question: under what circumstances can a business be regarded as a limited-purpose public figure by virtue of its advertising and solicitation activities?  The

---

 [4] Although Shadle acknowledges that his license had lapsed in violation of the Metals Act, the Complaint alleges that Shadle continued to maintain records of his precious metal transactions.  (¶¶ 16-19.)

*American Future* Court began by observing the "inevitable tension" in Pennsylvania law "between the goals of protecting freedom of expression and safeguarding reputation from unjust harm." *Id.* at 395 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997, 3008, 41 L.Ed.2d 789 (1974); *Norton v. Glenn*, 580 Pa. 212, 228, 860 A.2d 48, 58 (2004) (referring to the "seesawing balance between the constitutional rights of freedom of expression and of safeguarding one's reputation")).

Traditionally, Pennsylvania embraced the common law rules for defamation; "the defendant was strictly liable for the publication of a defamatory statement unless he could prove that the statement was true or that it was subject to a privilege." *Id.* at 396 (internal citation omitted). However, developments in the United States Supreme Court's First Amendment jurisprudence altered the traditional defamation analysis. *See id.* at 396-400. In its landmark decision *New York Times v. Sullivan*, 376 U.S. 254, 279-80, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court held that the Constitution prohibits public officials from being held liable for defamation absent a showing of "'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."

A decade later, the Court in *Gertz* held that a showing of actual malice is not required "where a private person's reputation is harmed, even where the speech pertains to a matter of public or general interest." *Am. Future*, 923 A.2d at 399 (citing *Gertz*, 418 U.S. at 346). "[S]o long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory

falsehood injurious to a private individual." *Gertz*, 418 U.S. at 347. In Pennsylvania, the

standard for a private-figure plaintiff to recover in a defamation action is negligence. *Am.*

*Future*, 923 A.2d at 400. As a result, a key inquiry in a defamation action is whether a

plaintiff is a public or private figure. *See id.* at 399-400.

> The *Gertz* Court categorized three types of public figures:
>
> (1) all purpose public figures, i.e., individuals who maintain a position of "such
> persuasive power and influence that they are deemed public figures for all
> purposes;"
>
> (2) involuntary public figures, i.e., individuals who become public figures
> without any "purposeful action;" and
>
> (3) limited purpose public figures, i.e., individuals who are deemed public
> figures only within the context of a particular dispute as a result of
> voluntarily "thrust[ing] themselves to the forefront of particular public
> controversies in order to influence the resolution of the issues involved."

*Mzamane*, 693 F. Supp. 2d at 498 (quoting *Gertz*, 418 U.S. at 345).

"Recognizing that public figures assume special prominence in the affairs of society, *Gertz*

observed that two characteristics are particularly relevant to such designation, namely, the

ability to rebut the defamatory statements due to greater access to the channels of

communication than private individuals and voluntary exposure to controversy." *Am.*

*Future*, 923 A.2d at 401 (citing *Gertz*, 418 U.S. at 344-45) (internal citations omitted). To

determine whether an individual qualifies as a limited-purpose public figure, "it is necessary

to consider the 'nature and extent of an individual's participation in the particular controversy

giving rise to the defamation.'" *Id.* (quoting *Gertz*, 418 U.S. at 352).

Nexstar asserts that Shadle is a limited-purpose public figure and, therefore, is required to demonstrate actual malice. Nexstar advances three arguments in support of this proposition, arguing that Shadle is a limited-purpose public figure because he (1) advertises, (2) is part of a "highly profile [sic] and highly regulated industry" and (3) was "the subject of a Press Release issued by the Monroe County District Attorney's Office." (Br. in Supp. at 10.) Nexstar cites *American Future* to show that advertising can create limited-public public figure status; however, *American Future* actually undercuts Nexstar's position.

Although the Pennsylvania Supreme Court rejected the proposition that commercial advertising can never form a basis for finding a plaintiff is a limited-purpose public figure, *American Future Systems* did not go as far as to require the inverse—that all small business owners who advertise are limited-purpose public figures. *See* 923 A.2d at 404. To the contrary, the Pennsylvania Supreme Court has stated that "inquiries into limited-purpose public figure status are particularized and fact-sensitive." *Id.* at 404-05 (citing *Snead v. Redland Aggregates Ltd.,* 998 F.2d 1325, 1329 (5th Cir.1993) ("[T]rying to decide whether a particular plaintiff is a public or private figure is much like trying to nail a jellyfish to the wall.")). As Shadle points out, Nexstar's position is essentially that any measure of advertising transforms a business into a limited-purpose public figure. (Br. in Opp., Doc. 11, at 7.) Accepting this position would make it hard to imagine any small business owner that would not be a limited-purpose public figure, and Pennsylvania law does not require such a bright line rule. *See Am. Future,* 923 A.2d at 404.

16

Comparing the facts alleged here to those of *American Future* and *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir. 1980), another case Nexstar cites (Br. in Supp. at 10-11), demonstrates how Shadle's allegations cannot be fairly read to cast Shadle as a limited-purpose public figure.  In *American Future*, the plaintiff "employed a force of 500 telemarketers at fifteen locations throughout the country to solicit 15,000 customers each week.  [The plaintiff]'s telemarketing director testified that these employees made approximately 25 million phone calls per year and actually spoke with 2.2 million business executives annually." 923 A.2d at 404.  *Steaks Unlimited* involved a plaintiff who "launched an intensive campaign over local radio stations, through local newspapers, by large signs displayed at the sales locations and by handbills given to persons walking near Steaks Unlimited Sales locations at the various Zayre stores.  The advertising costs exceeded $16,000.00." 623 F.2d 264 at 273 (internal quotations marks omitted).  As in *American Future,* 923 A.2d at 405, the *Steaks Unlimited* Court concluded that the plaintiff had "voluntarily injected itself into a matter of public interest" and, "through its advertising blitz, . . . invited public attention, comment, and criticism" 623 F.2d at 274.

Shadle, in contrast, is a sole proprietor with a sign in front of his business and a modest online presence.  Nexstar attaches to its Motion to Dismiss a screenshot of Shadle's yellowbook.com page.  (Ex. B.)  The web page, which includes basic information about Shadle's business and a copy of his business card, is basically the modern-day equivalent to an ad in a telephone book.  (*Id.*)  The Court cannot conclude, based on a sign outside

Shadle's place of business and a digital ad in the yellow pages, that his advertising is so pervasive as to make him a limited-purpose public figure. *See Am. Future,* 923 A.2d at 405; *Steaks Unlimited,* 623 F.2d at 273-74.

Further, the screenshot of Shadle's webpage is inappropriate for the Court to consider on a Rule 12(b)(6) motion since it is not included in the Complaint or "integral to or explicitly relied upon in the complaint." *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis and quotation marks omitted). "As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *Id.* In addition to the complaint itself, courts may also consider "exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010). None of these exceptions apply to the screenshot of Shadle's webpage.

Nexstar also attaches to its Motion to Dismiss a press release issued by the Monroe County District Attorney's Office. (Ex. A.) Nexstar argues that the Court can consider the press release since it is a matter of public record. (Br. in Supp. at 10 n.1.) Even if the Court were to accept this argument, it is unclear how the press release could form the basis for finding Shadle to be a limited-purpose public figure. The essential question in making such a finding is whether the plaintiff "assumed the risk of potentially unfair criticism by entering into the public arena and engaging the public's attention." *Steaks Unlimited,* 623 F.2d at

273. Here, the press release was issued by the Monroe County District Attorney's office, not Shadle. To the extent that Shadle was "thrust[ed] . . . into the vortex of" the public arena, it was the District Attorney's Office that did the thrusting. *See Gertz*, 418 U.S. at 352. Shadle did not voluntarily inject himself "into the vortex of [a] public issue, nor did he engage the public's attention in an attempt to influence its outcome." *See id.*[5]

Thus, the Complaint, even when read with Nexstar's Exhibits, does not allege that Shadle is a limited-purpose public figure. Therefore, Shadle need not plead actual malice. *See Am. Future*, 923 A.2d at 400. Nevertheless, the Complaint contains allegations of actual malice. (*See* ¶¶ 33-36.) In this context, actual malice is the publication of a defamatory statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 279-80. Here, Shadle alleges

> Defendant Nexstar, engaged in a defamatory media campaign against Plaintiff in an attempt to *maliciously discredit* Plaintiff by creating a story *designed to mislead* the public into thinking there was a public scam being operated and that the public needed to watch Defendant's news telecast in order to be informed of the alleged danger to the public. This was *done for the purposes* of increasing Defendant's ratings, which in turn would lead to an increase in advertising revenues.

> 34.   At the time aforesaid, Defendant Nexstar, *knowingly* and falsely stated that Plaintiff was a scam artist, a shady business[man] and had duped [his] customers and included the term "scam" or "scam artists" repeatedly, set against the image of Plaintiffs place of business.

---

[5] "NEXSTAR also submits that Plaintiff is a limited purpose public figure because his commodities business is high-profile and highly regulated." (Reply Br., Doc. 20, at 5.) However, Nexstar offers no evidence that Shadle operates a "high-profile" commodities business. Nor does it offer evidence that buying and selling gold is a particularly "highly regulated" industry. Finally, Nexstar cites no case law to support the proposition that owners of highly regulated, high-profile businesses are limited-purpose public figures. As a result, the Court does not find Nexstar's argument persuasive.

35. At the time aforesaid, Defendant *intentionally* and repeatedly broadcast and published the aforesaid false and defamatory communications to members of the general public.

(Compl. at ¶¶ 33-35 (emphasis added).)

While Nexstar is free to contest these allegations during discovery, the Complaint alleges intentional misrepresentations. As a result, Shadle has pled actual malice.

In sum, Nexstar's Motion to Dismiss Count II cannot be granted. (*Id.* at ¶¶ 32-42.)

### b. False-Light Invasion of Privacy

False-light invasion of privacy is one of four separate invasion-of-privacy-related torts recognized under Pennsylvania law. *Graboff*, 744 F.3d at 136. "Pennsylvania has adopted the definition of false light invasion of privacy from the Restatement (Second) of Torts, which imposes liability on a person who publishes material that 'is not true, is highly offensive to a reasonable person, and is publicized with knowledge or in reckless disregard of its falsity.'" *Id.* (quoting *Larsen v. Philadelphia Newspapers, Inc.*, 375 Pa. Super. 66, 543 A.2d 1181, 1188 (1988) (en banc) (citing Restatement (Second) of Torts § 652E)); *see Vogel v. W.T. Grant Co.*, 458 Pa. 124, 129 n.9, 327 A.2d 133 (1974). While "the Pennsylvania Supreme Court has not addressed the contours of falsity in the false-light-invasion-of-privacy context, the Superior Court has defined falsity broadly in that context." *Id.* Citing Pennsylvania precedent, the Third Circuit Court of Appeals explained,

A plaintiff can establish falsity by showing that a defendant "selectively printed or broadcast true statements or pictures in a manner which created a false impression." *Larsen*, 543 A.2d at 1189. Thus, even where a publication is

20

literally true, "discrete presentation of information in a fashion which renders the publication susceptible to inferences casting one in a false light entitles the grievant to recompense for the wrong committed." *Id.* at 1189. The Superior Court has drawn this broad definition from defamation law, which permits recovery where a publication was true, but implied falsehoods. *Id.*

*Id.* at 136-137.

"It can be difficult to distinguish between the tort of false light invasion of privacy and the tort of defamation. Some commentators have characterized false light as 'the right to be left alone,' whereas defamation protects one's interest in a good reputation, but the lines between them can blur." *Fanelle II*, 2000 WL 1801270, at *9. There are, however, some significant distinctions. *Id. Fanelle II* catalogued these differences:

> First, false light requires only proof of the falseness of the communication; it does not require harm to reputation or any other social consequences inherent in a defamation action. Thus, where a publication is false and offensive to plaintiff but might not harm the reputation of plaintiff, plaintiff would have a cause of action for false light, but likely would not be able to proceed with a defamation claim. Second, false light requires scienter, or at least reckless disregard, whereas defamation claims not involving public figures or matters of public concern require only a showing of negligence. Third, the communication must be highly offensive to a reasonable person in a false light claim, while there is no such requirement in a defamation suit. Fourth, false light requires "publicity," meaning widespread dissemination, as opposed to mere "publication" under defamation. Commentators appear to agree that a false light claim presents a higher hurdle for plaintiff to surmount than a defamation claim.

*Id.* (internal citations omitted) (citing *Rush v. Philadelphia Newspapers, Inc.*, 732 A.2d 648, 654 (Pa. Super. Ct. 1999); Rodney A. Smolla, *Law of Defamation*, Vol. 1, § 10:10 (2nd ed. 2000)).

Shadle has pled enough factors to support a claim of false-light invasion of privacy. First, as stated, Shadle has pled actual malice. Second, the Complaint alleges facts that, in

context, would be "highly offensive to a reasonable person." *See Graboff*, 744 F.3d at 136

(citing *Larsen*, 543 A.2d at 1188); *Fanelle I*, 79 F.Supp.2d at 563 (finding that presentation

of the plaintiff as an arrestee in a car theft investigation would be highly offensive to a

reasonable person). Nexstar's telecast could be construed as suggesting that Shadle (1)

was a scam artist and disreputable businessman, (2) who bought and sold stolen jewelry

and (3) purchased precious metals from his customers at predatory rates, exploiting the

desperation of a struggling economy. (*See* Compl., Exs. A-E.)

In sum, Shadle states a claim of false-light invasion of privacy.

### c. Negligence

In addition to defamation and false-light invasion of privacy, which are often pled and

analyzed together, *Graboff*, 744 F.3d at 137; *Fanelle II*, 2000 WL 1801270, at *9, the

Complaint also alleges a separate claim of negligence (Count I). (¶¶ 26-31.) Shadle

asserts that Nexstar's conduct was negligent

> (a) in failing to exercise due care when they falsely reported that Plaintiff was "scamming" his customers. Specifically, Defendant's [sic] reported that Plaintiff was a "scam artist," "shady business" and that Plaintiff had "duped [Plaintiff's] customers;"
>
> (b) in characterizing the clerical error of failing to renew the Precious Metals Act license as a "scam;"
>
> (c) in failing to include information about the Monroe County policy of "benign negligence."

(*Id.* at ¶ 26 (brackets in Complaint).)

Nexstar argues that Shadle's claim "should be dismissed with prejudice because there is no cause of action for negligent publication under Pennsylvania law." (Br. in Supp. at 7.)

Nexstar cites *Morgenstern*, 2008 WL 4792503, at *12. (*Id*. at 7-8.) *Morgenstern* mirrors the present action is several respects. *Morgenstern* involved a plaintiff who sued media defendants for defamation, false-light invasion of privacy and negligence. 2008 WL 4792503, at *1, 12. Just as Shadle fails to offer any authority to support an independent cause of action for negligence (Br. in Opp. at 16), Morgenstern similarly failed to cite case law to support his assertion that the media defendants owed him a duty of care. 2008 WL 4792503, at *12.

As a result, the *Morgenstern* Court dismissed the negligence claim. *Id*. The Court reasoned that the tort of defamation has been shaped to afford defendants certain First Amendment protections. *Id*. To allow a plaintiff to proceed with a separate negligent reporting claim, *Morgenstern* concluded, would be to circumvent those protections. *Id*.

Here, Shadle's defamation claim will ultimately require him to prove that Nexstar's conduct was at least negligent. *See Am. Future*, 923 A.2d at 400. If negligence is the standard, then Shadle's separate negligence claim would be duplicative. The conduct Shadle alleges in his negligence claim mirrors his defamation claim. As a result, Shadle would not be adversely affected by dismissal of his negligence claim, because it would essentially be subsumed into his defamation claim.

Alternatively, if it is later established that Shadle is a limited-purpose public figure, then Shadle will need to show actual malice. *See id.* Were an actual malice standard to apply, *Morgenstern*'s logic would be persuasive. *See* 2008 WL 4792503, at *12. Under this circumstance, permitting Shadle to proceed with a separate negligence claim would be to allow to him circumvent Nexstar's First Amendment protection. *See id.* He would be able to skirt the increased fault requirement despite pleading exactly the same conduct as the basis of his negligence claim.

In sum, while it may have made sense for plaintiffs plead defamation and negligence in the alternative in the pre-*New York Times* era—when defamation was pled as a strict liability offense, today plaintiffs in Pennsylvania must prove fault, at least negligence. *Am. Future*, 923 A.2d at 396, 400. Because Count I alleges the same course of conduct as Count II, the Court will dismiss Count I of the Complaint.

## V.   Conclusion

For the foregoing reasons, Defendant's Motion to Dismiss (Doc. 5) is **GRANTED** as to Count I (negligence) and **DENIED** as to Counts II and III (defamation and false-light invasion of privacy, respectively). A separate Order follows.

Robert D. Mariani
United States District Judge

24